IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HEATHER DADDONA FLOYD | : | CIVIL ACTION |
| | : | |
| v. | : | No.: 07-2340 |
| | : | |
| | : | |
| LIBERTY LIFE ASSURANCE COMPANY, et al. | : | |

**MEMORANDUM AND ORDER**

**Juan R. Sánchez, J.**                                        **January 31, 2008**

In this ERISA[1] case, Plaintiff Heather Daddonna Floyd moves for summary judgment alleging Defendants Liberty Mutual Group (Liberty Mutual) and Liberty Life Assurance Company (Liberty Life) wrongfully denied her claim for short term disability.  Defendants also move for summary judgment, arguing the denial of benefits was supported by the record.  Applying a slightly heightened arbitrary and capricious standard of review, requiring deference to the administrative decision remain mostly intact, I conclude Defendants' review of Floyd's claim was reasonable, supported by substantial evidence, and not erroneous as a matter of law.

**FACTS**

Since January, 2002, Floyd has worked as a senior customer service claims representative with Liberty Mutual.[2]  Floyd participates in Liberty Mutual's short term disability plan.  Due to back

---

[1]Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461.

[2]In footnote one of their summary judgment motion, Defendants state Floyd's employer is Liberty Mutual Insurance Company, not Liberty Mutual Group, contrary to Floyd's allegations.  To support this, Defendants cite the Declaration of Paula McGee, Liberty Life's litigation manager.  The Job Physical Demands Worksheet Floyd's supervisor provided to Liberty Life, however, lists Floyd's

pain, Floyd took short term disability leave from January 16, 2007 to April 30, 2007.

Liberty Mutual's short term disability plan continues pay when a disability keeps an employee from work for more than seven consecutive days and for up to 25 weeks. Benefits are paid when a fully-licensed physician certifies the employee is totally disabled and Liberty Life's claims investigations department determines benefits are payable. Total disability under the plan is defined as "the inability to perform all the material and substantial duties of his or her regular occupation at his or her pre-disability regular schedule because of injury or sickness." R. 7.

As both sponsor and administrator of the short term disability plan, Liberty Mutual fully funds, construes the terms of, administers the provisions of, decides all questions of eligibility for, and pays all the benefits of the plan. Liberty Mutual has final decision-making authority and responsibility for the plan. As provider of administrative services for the plan, Liberty Life processes and investigates claims, and when it determines a benefit payable, it makes a recommendation for benefit payment to Liberty Mutual.

On January 16, 2007, Liberty Life received notice of Floyd's claim for benefits. Melissa Long, a registered nurse in Liberty Life's claim investigations department, reviewed medical evidence from Floyd's treating physician, Dr. Mark Wendling,[3] and a description of the physical

---

employer as Liberty Mutual Group. Floyd does not respond to Defendants' footnote. I note Defendants' assertion here, but for the purposes of this Memorandum the distinction is unimportant.

[3]With her claim, Floyd submitted an office note dated January 16, 2007 and a February 5, 2007 Attending Physician's Assessment of Capacity both completed by Dr. Wendling. In the office note, Dr. Wendling noted Floyd had had x-rays several years ago showing osteoarthritis with spondylosis. Dr. Wendling further noted: Floyd had recurrent back pain; there was no trauma, but she did lift her son a great deal; and she denied any numbness or weakness, but pain worsened with movement. In the Assessment of Capacity, Dr. Wendling reported in an average eight-hour workday, Floyd was capable of the following: constant (over 5 ½ hours per day or over 40 min./hour) sitting, light grasping, fingering/typing, and lifting up to 10 lbs.; frequent (up to 5 ½ hours per day or up to 40

demands of Floyd's job from Liberty Mutual.[4]  Notably, Dr. Wendling reported Floyd could function

in an occupational setting full time within the capacities he noted.  Considering the medical evidence

in light of Floyd's job requirements, Nurse Long concluded Floyd's impairment was not severe

enough to preclude work.  On February 15, 2007, Liberty Mutual denied Floyd's claim.

On appeal, Floyd submitted additional medical records: a January 16, 2007 thoracic spine

x-ray showing no change from an x-ray taken on April 15, 2004;[5] a February 5, 2007 office note

from Dr. Wendling observing Floyd's back pain remained but was somewhat better; a new

Physician's Assessment of Capacity form completed by Dr. Wendling on February 20, 2007

containing significant changes from the February 5, 2007 Assessment of Capacity, though prepared

---

min/hour) standing, walking, driving, and force grasping; occasional (up to 2 ½ hours per day or up
to 20 minutes/hour) climbing, squatting, bending, kneeling, pushing/pulling, reaching overhead,
reaching below shoulders, and lifting up to and over 50 lbs.  Dr. Wendling also reported Floyd could
function in an occupational setting full time within the capacities he noted, and stated his opinion
was based on clinical experience, diagnostic tests, Floyd's self report, and clinical examination.  Dr.
Wendling further reported uncontrolled pain and unstable medical status prevented Floyd from
returning to work.

[4]The Job Physical Demands Worksheet prepared by Floyd's supervisor described Floyd's job
responsibilities as sitting at the computer, typing in claim information, and placing and answering
telephone calls.  The physical demands of Floyd's 7.5 hour work-day required frequent (3-6 hours)
sitting, keyboarding, and keyboarding while on the phone; occasional (1-3 hours) twisting of the
neck, telephone use, and simple grasping with the right hand; and infrequent (less than 1 hour)
walking, standing, bending of the neck and waist, squatting, twisting of the waist, simple grasping
of the left hand, and power grasping of the right and left hands.  Her physical demands never (0
hours) required climbing, kneeling, crawling, fine manipulation, pushing and pulling, or reaching.

[5]The x-ray result noted a history of degenerative disease, and reported the following: "There [are]
degenerative changes mostly involving the lower thoracic spine very similar to the study of
4/15/2004.  There is no fracture.  Impression: No change in moderate degenerative abnormality of
the lower thoracic spine."  R. 117.

only 15 days later.[6]  In the new assessment, Dr. Wendling reported considerable limitations in physical capacity[7] and stated Floyd could not function in an occupational setting full time.  Nurse Long reviewed the additional documents and noted Floyd had been diagnosed with degenerative changes of her lower thoracic spine in 2004.  Although she experienced a flare up of pain in January, 2007, the x-rays essentially were unchanged.  Based on the objective evidence showing no change in Floyd's physical condition from 2004, Nurse Long concluded the medical evidence did not support Floyd had less than sedentary capacity and maintained her initial assessment of Floyd.  On February 26, 2007, Liberty Mutual affirmed the denial and informed Floyd she had exhausted her right to administrative review.  Floyd's administrative case should have ended here.  Yet, Floyd's case was granted further review.

Floyd called the appeal review consultant handling her appeal and said she had not had the opportunity to submit additional information.  Although nothing indicated Floyd had intended to submit additional information, the review consultant gave Floyd until March 14, 2007 to submit additional evidence.  Floyd submitted a letter from Dr. Wendling[8] and physical therapy progress notes from February 13, 2007 through March 6, 2007.[9]  Upon review, Nurse Long reported the

---

[6]A cover letter by Floyd accompanying the additional documents indicated the first assessment had been filled out incorrectly.

[7]In the new assessment, Dr. Wendling reported, in an average eight-hour workday, Floyd could only occasionally sit, stand, walk, drive, climb, squat, bend, kneel, push/pull, forcefully grasp, reach overhead, reach below shoulders, and frequently lightly grasp and finger/type.

[8]In a March 6, 2007 letter, Dr. Wendling opined Floyd would improve, but her current level of pain precluded work.  Dr. Wendling further stated Floyd would be continuing on her current medication which "seemed to have stabilized her somewhat."  R. 87.

[9]The physical therapy notes show Floyd's pain scale ranged from two out of ten to ten out of ten during this period.  Floyd was also observed to have excessive thoracic spine curvature, but no

additional evidence did not alter her original assessment.

Following Nurse Long's report, the case was referred for independent medical review. Dr. L. Neena Madireddi, an independent physician board-certified in physical medicine and pain rehabilitation, conducted a peer review of the medical evidence and, at Floyd's request, consulted Dr. Wendling. Dr. Madireddi concluded Floyd had moderate lower thoracic degenerative disc disease and spondylosis, but was fully capable of performing the physical requirements of her sedentary job with identified restrictions.[10] Liberty Mutual notified Floyd it would not alter its original decision to deny benefits.

Thereafter, Floyd submitted an MRI taken on April 3, 2007, which Liberty Mutual accepted and reviewed with Nurse Long. Nurse Long determined the MRI would not alter Dr. Madireddi's findings because the MRI showed Floyd had degenerative disc disease of the mid-lower thoracic spine which Dr. Madireddi had already noted. LL-0028, 0053. The decision stood.

---

thoracic vertebrae misalignment and minimally palpable muscle spasms. Nurse Long observed the physical therapy progress notes indicated a decreased range of motion in the left shoulder, not in the thoracic spine.

[10]Regarding Floyd's restrictions, Dr. Madireddi reported: "With static posturing, based on the moderate degenerative changes of the thoracic spine, it would be appropriate that [Floyd] be afforded the opportunity to shift or change positions for a 2- to 3-minute time period every 60 minutes of continuous sitting." R. 62-63. Dr. Madireddi found Floyd to have no restrictions in the following: sitting, standing, and walking; upper extremity function, including handling, fingering, feeling, gripping, grasping, typing, and/or writing; cervical spine motion such as flexion, extension, or rotation; prolonged static cervical posturing or flexion; and squatting, kneeling, or balancing. In particular, Dr. Madireddi found Floyd would have no restriction with sitting, keyboarding, grasping, and twisting of the neck. Upon consulting Dr. Wendling, Dr. Madireddi noted Floyd was experiencing pain as she had in 2003 and in 2004. Bone scans and x-rays had not been particularly revealing. Dr. Wendling said he would like Floyd to return to work part-time and then full-time. Dr. Madireddi determined the conversation did not offer any additional information supporting any alteration of her review of the medical evidence.

**DISCUSSION**

Parties filed cross motions for summary judgment on Floyd's ERISA claim challenging Liberty Life's denial of benefits.[11]  A motion for summary judgment will only be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c).  The Court must review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,587 (1986); *Stephens v. Kerrigan*, 122 F.3d 171, 176-77 (3d Cir. 1997).  In considering a motion for summary judgment, a court does not resolve factual disputes or make credibility determinations and must view the facts and inferences in the light most favorable to the party opposing the motion.  *Big Apple BMW, Inc. V. BMW of N.A., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied.*, 507 U.S. 912 (1993).  When considering cross motions for summary judgment, this Court must consider each motion separately, drawing inferences against each movant

---

[11]In support of its motion, Floyd seeks to admit additional medical evidence consisting of two April 12, 2007 physicians' notes related to an epidural steroid injection she received for her back pain, and a May 9, 2007 and May 11, 2007 physician's notes regarding ongoing treatment for the back pain. Under the arbitrary and capricious standard of review, a court is limited to the "evidence that was before the administrator when he made the decision being reviewed."  *Mitchell v. Eastman Kodak Co.*, 113 F.3d. 433, 440 (3d Cir. 1997).  This is also true of the heightened arbitrary and capricious standard. *Oslovski v. Life Ins. Co. Of N. Am.*, 139 F. Supp. 2d 668, 675-676 (3d Cir. 2001).  There are, however, exceptions to this rule.  The Court is allowed to review outside "evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice relating to a claim." *Id.* at 676.  In addition, courts are allowed to consider extrinsic evidence when deciding how much to heighten the standard of review.  *Post v. Hartford Ins. Co.*, 501 F.3d 154, 168 (3d Cir. 2007).  However, this evidence "must show potential biases and conflicts."  *Id*.

Floyd merely submits the new evidence without showing how the evidence would assist my understanding of the medical terminology or practice, or demonstrating how it shows potential biases or conflicts to assist in my determination of how much to heighten the standard of review.  Floyd does not even rely on the new evidence in her briefs.  Thus, I will not admit the additional evidence.

in turn. *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir. 1996).

The default standard of review for ERISA is *de novo*. *Firestone Tire & Rubber Co. v. Bruch*, 189 U.S. 101, 115 (1989). If, however, "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *id.*, the standard of review is "arbitrary and capricious." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d. 377, 378 (3d Cir. 2000). The standard is heightened along a sliding scale when an administrator acts under a conflict of interest. *Pinto*, 214 F.3d at 378. Along the sliding scale, the degree of scrutiny is intensified, or "heightened," to match the degree of the conflict. *Id.* at 378. "This approach grants the administrator deference in accordance with the level of conflict." *Post v. Hartford Ins. Co.*, 501 F.3d 154, 161 (3d Cir. 2007). Under traditional arbitrary and capricious standard, "an administrator's decision will only be overturned if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pinto*, 214 F.3d at 387. "[I]f the level of conflict is slight, most of the administrator's deference remains intact, and the court applies something similar to traditional arbitrary and capricious review." *Post,* 501 F.3d at 161. At the other end of the scale, under a heightened arbitrary and capricious review, the Court is deferential but not absolutely deferential. *Id.* at 393.

To determine the level of conflict, the Court must consider the existence of both structural and procedural factors. *Post*, 501 F.3d at 162. The structural inquiry asks whether the structure of the plan raises concerns about the administrator's financial incentive to deny coverage improperly. *Id.* at 163. Such structural factors include: "(1) the sophistication of the parties, (2) the information accessible to the beneficiary, (3) the financial arrangement between the employer and the administrator, and (4) the financial status of the administrator." *Id*. Cases have further considered

7

the administrator's claim evaluation process as an additional factor, "according more deference to administrators that use an independent body to evaluate claims (thus lessening the effect of any conflict)." *Id.* (citing *Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 255(3d Cir. 2004)).

The procedural inquiry's aim is identifying evidence of bias in the administrator's decision-making process. *Post*, 501 F.3d at 164. Procedural irregularities raising suspicion of bias include: "(1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical examination when all of the evidence indicates disability." *Id.* at 164-165.

I review the denial of benefits challenged here under a slightly heightened arbitrary and capricious standard. Because the benefit plan expressly grants Liberty Mutual, the plan sponsor and administrator, discretionary authority to construe the terms of the plan, determine eligibility for benefits, and decide any other matters relating to the administration or operation of the plan, arbitrary and capricious review is warranted. *See Pinto*, 214 F.3d at 378. The standard requires heightening because Liberty Mutual funds, interprets, and administers the benefits plan. *See id* at 383; *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan*, 298 F.3d 191, 197 (3d Cir. 2003). Cases where the employer or independent insurer funds, interprets, and administers the benefits plan generally present a conflict of interest, and some form of heightened review is appropriate. *Pinto*, 214 F.3d at 383; *Smathers*, 298 F.3d at 197.

Taking into account both structural and procedural factors, I find the level of conflict slight. The only potential conflicts alleged by the facts are structural, involving the financial arrangement and the claim evaluation process. Liberty Mutual is both the employer and administrator, pays

8

benefits out of its own operating funds,[12] interprets and administers the plan, decides questions of eligibility, and has final authority on all claims.  Liberty Life conducts the investigation of claims and makes recommendations which are reviewed by Liberty Mutual before it makes a final determination.  Liberty Life's claim evaluation is not independent and thus does not lessen any existing conflict.  *Post*, 501 F.3d at 163.  Given that Liberty Mutual both funds and ultimately administers its own plan after delegating the initial phases of administration to Liberty Life, a slightly heightened arbitrary and capricious standard is appropriate.[13]  *See Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 254 (3d Cir. 2004).  Where the plan administrator has a strong incentive to construe claims in a light most favorable to it, this structure alone gives rise to a heightened scrutiny.  *Post*, 501 F.3d at 164 (citing *Pinto*, 214 F.3d at 389-90).

As to the remaining structural factors, Floyd does not allege a sophistication or information imbalance, nor does she allege the financial status of Liberty Mutual created a potential conflict.  The record does not show Floyd  lacked sophistication in her understanding of insurance claims.  *Cf. Stratton*, 363 F.3d at 255.  Through her work as a customer service claims representative in the insurance industry, she had experience with the insurance claims process.  She also demonstrated her familiarity with the claims process as she communicated closely with Liberty Mutual throughout

---

[12]When an administrator pays claims out of its operating budget, rather than from monies set aside, this raises concerns.  *Post*, 501 F.3d at 163.

[13]Defendants contend a mere, or traditional, arbitrary and capricious standard of review should apply because any conflict created by the self-funded structure of the plan is ameliorated by Liberty Mutual's incentive to maintain employee morale.  Although a high level of deference has been given to the decisions of an employer with "incentives to avoid the loss of morale and higher wage demands that could result from denials of benefits," these incentives "do not apply with the same force to an [employer] that pays benefits out of its own coffers."  *Pinto*, 214 F.3d at 378 (citing *Nazay v. Miller*, 949 F.2d 1323, 1335 (3d Cir. 1991).

the appeals process.  The record also reveals Liberty Mutual and Liberty life made conscientious efforts to keep Floyd apprised of the information they had and the reasons behind their decision to deny benefits.  *See Stratton*, 363 F.3d at 254 (finding no information imbalance where record showed insurer's conscientious effort to keep claimant apprised of claim review process).  Finally, Floyd presented no evidence the financial health or long term plans of Liberty Mutual undermined the claims process.  *See, e.g., Post*, 501 F.3d at 164 (explaining "when the employer is in financial difficulty, the dissatisfaction of employees is less likely to be an incentive favoring them because paying off creditors will probably take priority over keeping up employee morale").

Floyd does not argue any existing procedural factors raises potential conflicts.[14]  I also cannot find any procedural irregularities or bias in the claim evaluation or appeal process.  Claim evaluation was thorough and review of the case went beyond what was required.  Liberty Mutual would not have acted improperly in denying review beyond February 26, 2007 when Floyd's denial was upheld on appeal, but allowed Floyd to submit additional evidence even after the final decision and further referred the case for peer review by Dr. Madireddi.  I am given no reason to doubt the procedural neutrality of the administrative review.  *See Post*, 501 F.3d at 165.

The structural conflicts alone without evidence of procedural bias result in a slight level of

---

[14]In arguing the merits, Floyd asserts Dr. Wendling's second capacity assessment of Floyd was arbitrarily rejected.  Assuming this argument goes to the second procedural factor considered, the self-serving selectivity in the use and interpretation of physicians' reports, I am not persuaded.  The record shows this report was considered and weighed against the other evidence in the record.  The report was inconsistent with and unsupported by Dr. Wendling's first capacity assessment completed 15 days earlier, the objective evidence of Floyd's x-ray results, and Dr. Madireddi's telephone conversation with Dr. Wendling about his evaluation of Floyd.  Moreover, ERISA does not require "plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).

conflict.  *See Post*, 501 F.3d at 164.  Employing the sliding scale, the slight level of conflict corresponds with a slightly heightened arbitrary and capricious standard of review.  *Pinto*, 214 F.3d at 378.  The deference accorded to the administrative decision remains mostly intact.  I apply "something similar to traditional arbitrary and capricious review," *Post*, 501 F.3d at 161, and defer to the administrator's "reasonable and carefully considered conclusions."  *Id.* at 164.

Applying the slightly heightened arbitrary and capricious standard of review to the facts, I conclude the Defendants' determination was reasonable, supported by substantial evidence, and carefully considered.  Floyd argues Defendants arbitrarily rejected Dr. Wendling's second Physician's Assessment of Capacity.  The record shows otherwise.  Fifteen days prior to the second assessment, Dr. Wendling completed the first Physician's Assessment of Capacity, concluding Floyd's limitations would allow her to work full time in her job.  The office note Dr. Wendling submitted along with the assessment did not note any condition to the contrary.  Yet, 15 days after the first assessment, Dr. Wendling completed a second assessment markedly inconsistent with the first assessment.

The second assessment noted numerous limitations that were not on the first assessment and concluded Floyd was unable to work full time in her job.  Dr. Wendling's March 6, 2007 letter to the administrator, although stating Floyd's pain precluded work, did report Floyd's medication seemed to have stabilized her somewhat.  The second assessment was submitted along with an x-ray result reporting Floyd had a history of degenerative disc disease and there was no change from an x-ray taken nearly three years prior.  An MRI submitted later also showed degenerative disc disease, which did not contradict anything else in the record.  In addition, Dr. Madireddi, in her peer review of the medical evidence, consulted Dr. Wendling and was informed Floyd had experienced similar

11

pain in the past and the objective tests had not been particularly revealing.  This comported with Dr. Madireddi's conclusions based on the evidence.

Dr. Wendling's second capacity assessment is simply contradicted by overwhelming evidence in the record.  It is inconsistent with his other reports and unsupported by the objective evidence of x-ray and MRI results.  Moreover, ERISA does not require "plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition." *Nord*, 538 U.S. at 825.  Similarly, ERISA does not "impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Id.* at 831.  The substantial evidence supports the conclusion Defendants' denial of benefits was reasonable.

In addition, the record demonstrates Defendants' determination was carefully considered. Floyd was permitted to submit additional documentation for review even after the decision should have been final.  The case was further referred for peer review and, upon Floyd's request, Dr. Wendling was consulted by telephone.  Defendants' decision to deny Floyd's claim, when reviewed under a slightly heightened standard, was neither arbitrary nor capricious.

An appropriate order follows.